## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                          Crim. No. 10-239 (MJD/JJG)

                    Plaintiff,

v.                                                 REPORT AND RECOMMENDATION

Earl Louis Ollie,

                    Defendant.

JEANNE J. GRAHAM, United States Magistrate Judge

This case came before the undersigned United States Magistrate Judge for pretrial motion hearings on December 29, 2010 and February 3, 2011. Michael Dees appeared on behalf of the United States of America. Andrea George appeared on behalf of Defendant Earl Louis Ollie. The case was referred to this Court for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.

Presently before the Court are Defendant's Motion to Suppress Evidence, Motion to Suppress Statements, and Motion to Reopen Hearing. Defendant seeks to suppress drugs seized from his person, a gun seized from his vehicle, and statements he made to law enforcement officers. The parties agree that all issues depend on the legality of searches of Defendant and his vehicle. Because the Court concludes that the searches were unlawful, the Court recommends that Defendant's motions be granted.

## I.    PROCEDURAL HISTORY

Defendant was indicted on September 9, 2010 for being a Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). His pretrial motions, including the suppression motions presently before the Court, were heard initially on December 29, 2010. The

Government presented evidence on the searches through the testimony of Minneapolis police officer Amanda Saengdara. At the conclusion of the hearing, the parties requested an opportunity to file post-hearing briefs, which was granted. On January 4, 2011, the day the memoranda were due, the Government produced to Defendant a DVD of the traffic stop at issue. Defendant requested and received a brief extension to review and incorporate the new evidence into his memorandum. Defendant filed his brief on January 6, 2011, and also provided a copy of the DVD, which was received by the Court without objection and marked as Defendant's Exhibit 1. The Court took the suppression motions under advisement and issued a Report and Recommendation (R&R), recommending that the motions to suppress be denied.

In the R&R, the Court found that Saengdara had probable cause to stop Defendant for two traffic violations. The Court also found that Saengdara had a reasonable, articulable suspicion that Defendant's vehicle was stolen, and thus reason to believe that Defendant may possess a weapon. Based on these findings, the Court concluded that a subsequent frisk for weapons was lawful. The frisk yielded two bags of marijuana and a bag of suspected crack-cocaine. The Court found that the discovery of this contraband, in addition to Saengdara's suspicion that Defendant had recently stolen the car, provided a basis to search the entire vehicle.

On January 25, 2011, Defendant filed objections to the R&R and a motion to reopen the suppression hearing. Defendant explained that, in addition to the DVD, he had recently discovered new evidence showing that Saengdara and her partner knew he was the owner of the vehicle before they searched him and his car. The Government did not oppose the motion to reopen, and the Court scheduled a hearing for February 3, 2011.

At that hearing, Defendant called as witnesses Freedom Auto Sales employee Gustavo Morelos, Federal Defender's Office Investigator Timothy Trebil, and Minneapolis Police Officer

Justin Saint Jean. Defendant also testified. Defendant introduced evidence of squad car queries on the night of August 9, 2010 (Def. Exs. 1, 2, 3); a motor vehicle query on January 24, 2011 (Def. Ex. 4); a driver's license query on January 24, 2011 (Def. Ex. 5); a receipt from Freedom Auto Sales dated July 16, 2010 (Def. Ex. 6); a bill of sale from Freedom Auto Sales dated July 16, 2010 (Def. Ex. 7); a twenty-one day temporary permit dated July 16, 2010 (Def. Ex. 8); a set of keys (Def. Ex. 11); Defendant's wallet (Def. Ex. 12); a tow request (Def. Ex. 13); a vehicle impound report (Def. Ex. 14); and Defendant's Catholic Charities identification card (Def. Ex. 15).[1] Saengdara provided additional testimony for the Government, and the Government introduced four photographs of Defendant's vehicle (Gov't. Exs. 1, 2, 3, 4).

Following the evidentiary portion of the second hearing, the parties asked to file another round of briefs. Defendant filed his memorandum on February 14, 2011, and the Government filed its memorandum on March 2, 2011. The Court took the motions under advisement at that time.

## II.   RELEVANT FACTS

To provide a cohesive account of the relevant facts, the Court will combine the evidence and testimony adduced at the two hearings into a single narrative. The Court will take note where the testimony or evidence meaningfully differed between the two hearings.

On July 16, 2010, Defendant purchased a 1995 Mercury Villager from Freedom Auto Sales for $390. Freedom Auto Sales employee Gustavo Morelos, who conducted the transaction, testified that the low purchase price meant the car had a serious defect such as a bad transmission, poor power steering, a knocking engine, or a broken steering column. Typically,

---

[1]     For chain of custody purposes, Investigator Timothy Trebil retained the set of keys and Defendant's wallet after the hearing. Photocopies of the exhibits were provided to the Court.

when a customer wants to test drive a car, Morelos asks for a driver's license and either makes a photocopy or keeps the license during the test drive.

Cars offered for sale at Freedom Auto Sales are registered to the dealership and flagged on the state vehicle registration database as "held for resale." This permits the dealership to avoid having to retitle the cars. Once a car is purchased, the dealership's registration information and resale flag remain on the database until title is formally transferred. In Defendant's case, the registration tabs on the Villager were expired, so Morelos affixed a twenty-one day temporary permit to the rear windshield on the driver's side, as required by law. Defendant's driver's license number was written on the permit, but not his name. Freedom Auto Sales is listed as the dealer.

On August 9, 2010, Minneapolis Police Officers Saengdara and Saint Jean were working the overnight patrol shift in south Minneapolis. They were driving westbound on 31st Street in a marked squad car around 3:18 a.m., when Saengdara noticed the Villager in front of her. Saengdara observed that the vehicle had a chain hanging from the rearview mirror and no rear license plate light. Although it was nighttime, streetlights allowed Saengdara to see inside the minivan.

At the first hearing, Saengdara testified that she entered the minivan's license plate number into her squad car computer, but no information came back about the registered owner.

Q.      And what information came back?

A.      It didn't come back.

Q.      What do you mean "it didn't come back"?

A.      It doesn't show the owner of the vehicle.

4

Q.      So you don't know who the owner is.

A.      No.

(Mot. Hr'g Tr. 35, Dec. 29, 2010.)

At the second hearing, Defendant introduced a printout of Saengdara's squad car computer query results, which identified the registered owner of the Villager as Freedom Auto Sales and flagged the minivan as held for resale. Saengdara confirmed through testimony that she knew the Villager was owned by an auto dealership before she approached the minivan.

Q.      And when you approached that car, you see – you know that it's owned by an auto dealer; right?

A.      Yes.

(Mot. Hr'g Tr. 52, Feb. 3, 2011.) Saengdara explained that her testimony at the first hearing was intended to convey that the ownership information "didn't come back to an individual owner." (*Id.* at 47.) The Court accepts Saengdara's explanation, but finds she knew the Villager was registered to a dealership and was being held for resale.

Based on the missing license plate light and the chain hanging from the rearview mirror, Saengdara activated her lights, and the Villager pulled over. A videocamera on the dashboard of the squad car was also activated. The video shows a search light aimed at the minivan, and the temporary permit in the back rear window is clearly visible. Saengdara and Saint Jean both testified, however, that they did not notice the sticker because they were focusing on the driver. Saengdara approached the driver's side of the minivan, and Saint Jean approached the passenger's side.

Saengdara testified at the first hearing that she asked Defendant for his driver's license and proof of insurance. Defendant "didn't respond right away. He was trying to, like – kind of

5

looking for it and just mumbling, then he told me that the dealership guys have it. They made a copy of it and forgot to give it back to him." (Mot. Hr'g Tr. 32, Dec. 29, 2010.) Defendant told Saengdara that he had recently purchased the car and that the dealership had taken his license to make a copy. Saengdara did not recall if Defendant told her his name at this time.

The squad car video shows Defendant handing Saengdara what looks to be two pieces of letter-sized paper about a minute after she approached the Villager. A few seconds later, Defendant handed her another, smaller item. Defendant testified at the second hearing that he gave her "the bill of sale for the vehicle" and a "Catholic Charities photo ID card." (Mot. Hr'g Tr. 90, 91, Feb. 3, 2011.) Saengdara testified that she could not remember any papers or a photo identification. The video shows Saengdara glancing at the documents before continuing to speak with Defendant.

Meanwhile, Saint Jean saw through the passenger window that the Villager's steering column had been "punched" and that the car was running without a key in the ignition. He asked Defendant about the steering column, and Defendant said it was like that when he bought the car. Based on Saengdara's training and experience, a punched column indicates that a car is "fresh stolen," and she believed Defendant was lying.[2]

Saint Jean then walked to the back of the minivan. The squad car video shows him shining his flashlight on and examining the area of the rear windshield on which the temporary permit was affixed, but he testified at the second hearing that he did not remember seeing the sticker. Next, Saint Jean walked around the minivan and took the documents from Saengdara. The squad video shows him examining the papers while looking at the left rear windshield where

---

[2]     Saengdara has worked as a patrol officer for the Minneapolis Police Department for three years. She has seen several punched steering columns during that time, all in recently stolen cars.

the permit was located. After further questions by the defense, Saint Jean conceded at the second hearing that the video showed him looking at the permit.

Saint Jean directed Saengdara to order Defendant out of the minivan, which she did, and the officers escorted him to the squad car. Saengdara testified they decided to search Defendant because they believed he was armed and dangerous. She did not see a bulge in Defendant's pockets or anything in the car of a dangerous or incriminating nature. Saengdara, Saint Jean, and Defendant are not visible for the next minute or so while Defendant is being searched, but the video shows a wallet, money, papers, a hat, and other objects being tossed on the hood of the car. When Saengdara reappears into view, she places the papers and an identification-sized item on the hood of the car, and compares some of the items removed from Defendant's pockets with the papers or the smaller item laying on the hood of the car.

The Court must pause here to resolve some discrepancies in the record. First, the Court finds that one of the documents Defendant handed to Saengdara before he was ordered out of the car was the bill of sale for the Villager. Defendant's testimony on this point is unrefuted, and the officers' treatment of the document, as evidenced on the video, is entirely consistent with this finding. The bill of sale included information such as Defendant's driver's license number, name, address, and date of birth; a description of the car and vehicle identification number; dealership information for Freedom Auto Sales; and the purchase price of $390. The officers had all of this information before they ordered Defendant out of the car and searched him.

Second, the Court finds that Defendant gave Saengdara a photo identification—his Catholic Charities community card—as she stood outside his car. This testimony is consistent with the video showing Defendant handing her a smaller item a few seconds after giving her the bill of sale. The video also shows Saengdara later placing an identification-sized item on the

hood of the squad car along with the bill of sale. As for Saengdara's testimony, she simply could not remember what the smaller item was, which is not surprising given the hundreds of traffic stops she has conducted since August 2010. Of further significance, the only photo identification introduced in the record from Defendant's possessions is his Catholic Charities community card, which was inventoried and bagged separately from his wallet. These facts, though relatively minor, further support the Court's finding. Defendant's Catholic Charities identification includes his name, photograph, and date of birth.

Finally, the Court accepts Saint Jean's testimony that he does not remember seeing the temporary permit on the rear windshield of the Villager. But, as Saint Jean conceded, the DVD shows him examining the bill of sale while looking at the rear windshield where the permit was located. The Court accordingly finds that Saint Jean possessed all of the information on the bill of sale and the temporary permit before he instructed Saengdara to order Defendant out of the car.

The Court now returns to the recitation of facts. Although Saint Jean's search of Defendant occurred just out of the videocamera's range, the DVD shows a multitude of items, including a wallet, money, and papers, being tossed indiscriminately on the hood of the squad car. According to testimony, two pocketknives, a screwdriver, two bags of marijuana, and a bag of suspected crack-cocaine were also removed from Defendant's pockets. Defendant was then handcuffed and placed in the back of the squad car. The officers also sat in the car, asked Defendant some routine questions, and ran a query on Defendant's driver's license. Although Saengdara testified at the first hearing that she queried Defendant's driver's license after she searched the minivan, the printed query results and the DVD show that she learned Defendant

had a valid license moments after he was searched and before she searched his vehicle. At one point, Saint Jean told Defendant he needed to fix his ignition switch because it was dangerous.

While Saint Jean and Defendant talked inside the squad car, Saengdara searched the minivan. She found a gun under the driver's seat, and Defendant was arrested for carrying a weapon without a permit. The officers transported Defendant to jail, and he made several incriminating statements during the ride. Defendant was later interviewed at the jail by a different officer after being advised of and waiving his *Miranda* rights.

In Saint Jean's subsequent report about the incident, he indicated that Defendant was the owner of the minivan. Saengdara testified at the first hearing that the notation simply meant that Defendant was the driver, not necessarily the registered owner.

## III.    DISCUSSION

### A.    The Legality of the Traffic Stop

Defendant does not dispute that probable cause existed for the traffic stop. When a law enforcement officer observes even a minor traffic violation, she has probable cause to stop the vehicle. *See United States v. Cummins*, 920 F.2d 498, 500 (8th Cir. 1990). Here, Defendant was driving a vehicle without a rear license plate light and with a chain hanging from the rearview mirror, both of which are violations of traffic laws.

### B.    The Search of Defendant

Defendant argues that the officers unlawfully expanded the scope of the traffic stop when they asked him to exit the car and searched him. The Government responds that the officers had a reasonable, articulable suspicion that the minivan was stolen, which provided grounds to order him from the car and frisk him for weapons.

Regarding the officers' removal of Defendant from the minivan, it is well-established that a driver may be ordered to exit his vehicle during a stop for a traffic violation. *See Pennsylvania v. Mimms*, 434 U.S. 106, 108-11 (1977). But to expand the scope of a traffic stop beyond that which justified the stop in the first instance, an officer must be "aware of 'particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.'" *United States v. Shafer*, 608 F.3d 1056, 1062 (8th Cir. 2010) (quotation and citation omitted). A court must consider "the totality of the circumstances, in light of the officer's experience." *United States v. Gill,* 513 F.3d 836, 844 (8th Cir. 2008) (quotation omitted). Reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)).

In the case at hand, the particularized and objective facts viewed from the perspective of a reasonable officer on the scene did not create a reasonable suspicion that Defendant had recently stolen the Villager. A license plate query before the stop revealed that the minivan was registered to Freedom Auto Sales and flagged for resale. This was consistent with Defendant's statement that he had recently purchased the car. Although Defendant did not respond immediately to Saengdara's request for his driver's license, but mumbled and rummaged around, this conduct was consistent with his explanation that he had left his license at the dealership. Defendant then handed Saengdara the bill of sale for the Villager and his Catholic Charities identification. The bill of sale included Defendant's name, driver's license number, address, and date of birth; a description of the car and the vehicle identification number; information about the dealer, Freedom Auto Sales; and the date of purchase and purchase price. The Catholic Charities card included Defendant's photo, name, and date of birth, the latter two of which matched the

information on the bill of sale. From the temporary permit, Saint Jean knew Defendant's driver's license number, which matched the bill of sale; the year, make, and vehicle identification number of the Villager, which matched the bill of sale; and the dealer, Freedom Auto Sales, which matched the bill of sale and the registration database.

The two main circumstances suggesting that the minivan might be stolen were the punched steering column and Saengdara's belief that Defendant was lying. In light of all the circumstances known to Saengdara, however, her belief that Defendant was lying was not reasonable. Defendant had given her the bill of sale and a photo identification, which together proved that he was Earl Ollie and that he owned the minivan. Further, his statements were consistent with his claim of ownership. As for the punched steering column, there is no question that this defect should prompt an officer to ask questions to confirm or dispel any misgivings. Saint Jean did so, and Defendant responded that the steering column was punched when he bought it. This explanation was consistent with Defendant's claim of ownership and all the documentation in the officers' possession. If Saengdara and Saint Jean harbored any doubt about the ownership of the minivan at this point, a few simple inquiries such as calling a dispatcher for reports of recently stolen vehicles and checking Defendant's driver's license information would have quickly dispelled any suspicion that Defendant had stolen the car.

Consequently, the Court finds that the officers did not have a reasonable and articulable suspicion that Defendant's car was stolen, and thus that he was armed and dangerous, when they searched him. This is the only basis the Government has offered to justify the search of Defendant's person. Accordingly, the Court concludes that the search of Defendant was unlawful and recommends that all evidence seized from him be suppressed.

### C.      The Search of the Minivan

Defendant contends that the officers did not have probable cause to search his minivan. The Government responds that probable cause was provided by the discovery of drugs in Defendant's pocket and by the officers' belief that the minivan was stolen. The Court has concluded otherwise; the officers' belief was not reasonable and the drugs were unlawfully discovered. Consequently, there was no probable cause to search the minivan, and its contents should be suppressed.

### D.      Defendant's Statements

Defendant asks to suppress the statements he made following his arrest as fruits of the unlawful searches. "Under the 'fruit of the poisonous tree' doctrine, the exclusionary rule bars the admission of physical evidence and live witness testimony obtained directly or indirectly through the exploitation of police illegality." *Hamilton v. Nix*, 809 F.2d 463, 465 (8th Cir. 1987) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963)). The Government has conceded that the admissibility of Defendant's statements is contingent on the legality of the searches, and has offered no alternative grounds for their admission. Accordingly, the Court recommends that Defendant's statements be suppressed.

## IV.     RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 15) be **GRANTED**;

2.      Defendant's Motion to Suppress Statements, Admissions, and Answers (Doc. No. 16) be **GRANTED**; and

12

3.      Defendant's Motion to Request Reopening of Motion Hearing (Doc. No. 43) be **GRANTED**.


Dated: March 8, 2011                                    s/ *Jeanne J. Graham*

_____
JEANNE J. GRAHAM
United States Magistrate Judge


## NOTICE

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **March 23, 2011**.  A party may respond to the objections by **April 7, 2011**.  Any objections or responses shall not exceed 3,500 words.  The District Judge will make a de novo determination of those portions of the Report and Recommendation to which objection is made.  The party making the objections must timely order and file the transcript of the hearing unless the parties stipulate that the District Judge is not required to review a transcript or if the District Judge directs otherwise.